```
RECEIPT # 34585
AMOUNT $ 150.°°
SUMMONS ISS. 7-1
LOCAL RULE 4.1
WAIVER OF ___
MCF ISSUED ___
AO 120 OR 121 ___
BY DPTY CLK  rmm
DATE 10-19-01
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

CHRISTINE STONE, AS ADMINISTRATRIX )
OF THE ESTATE OF BRETT STONE, AND )
INDIVIDUALLY                    Plaintiff )
                                          )
vs.                                       )   01cv11817WGY
                                          )
FRONTIER AIRLINES, INC.,                  )
      Defendant                           )

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

This is a wrongful death action seeking compensatory and punitive damages and damages pursuant to Chapter 93A against a domestic airline for failing to have an automatic external defibrillator (AED) on board to resuscitate Brett Stone, who suffered a sudden cardiac arrest on July 27, 2000 while on board the defendant's flight from Boston to Denver. Sudden cardiac arrest, the leading cause of death in the United States, kills more than 350,000 people each year. The vast majority of these events are caused by an abnormal heart rhythm, most commonly ventricular fibrillation. In ventricular fibrillation, the heart's pumping action stops abruptly, and death ensues in minutes unless normal heart rhythm is restored. The only definitive way to do this is to use a defibrillator to reorganize the heart's electrical system. The chance of survival decreases by 7% to 10% each minute that elapses between the onset of fibrillation and defibrillation efforts. Cardiopulmonary resuscitation (CPR) alone is not effective in increasing survival. Airline passengers suffering sudden cardiac arrest in flights not equipped with AEDs are condemned to certain death.



245093

Defibrillator technology had advanced to the point by the early 1990s that defibrillation could be accomplished reliably by lay responders, including flight attendants, using AEDs. AEDs are portable, lightweight, compact, virtually maintenance-free and simple to use. They cost a little over $2,000.00 per unit. AEDs use voice prompts to guide the operator in their use and will not give a shock unless one is needed. By July 27, 2000, most major United States domestic airlines and many smaller carriers had deployed AEDs on board their planes and had saved many lives which would otherwise have been lost. These successful resuscitation efforts received widespread publicity in the popular, medical and trade press and were the subject of Congressional hearings and intensive industry discussion. Frontier Airlines ignored this information and industry trend and chose to dispatch its aircraft without AEDs, full well knowing that persons like Brett Stone, who suffered sudden cardiac arrest while a passenger, would die.

## PARTIES

1. The plaintiff, Christine Stone, is a resident of Middlesex County, Massachusetts and is the Administratrix of the Estate of her late husband, Brett Stone. She was appointed Administratrix on January 11, 2001, by order of the Suffolk County Probate Court, Boston, Massachusetts. She is duly qualified and authorized to bring this action in this capacity and individually.

2. Frontier Airlines, Inc. ("Frontier") is a Delaware corporation with a principal place of business in Denver, Colorado. Frontier is a common carrier of passengers for hire.

## JURISDICTION

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332. There is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

245093

## FACTS

4. On July 27, 2000, plaintiff's husband and decedent, Brett Stone, was 28 years old. He was a NCAA record holder in swimming and a successful businessman and venture capitalist.

5. While in college, Mr. Stone started a social service agency at the University of Texas, which remains active to this day. The Harvard Business School had accepted him into its MBA program and he planned to matriculate in January, 2001.

6. On July 27, 2000, he was thought to be in good health and had no known heart condition.

7. On July 27, 2000, the plaintiff and Brett Stone were flying on vacation from Boston to San Francisco on Frontier Flight 419.

8. Flight 419 originated in Boston, Massachusetts. All arrangements for the flight were made in Boston, Massachusetts.

9. On July 27, 2000, while in flight over the western United States, Mr. Stone suffered a cardiac rhythm disturbance which resulted in a cardiac arrest.

10. His wife, the plaintiff, who was seated at his side, recognized that her husband was in distress and immediately alerted a flight attendant.

11. Within seconds, Frontier flight personnel went on the plane's public address system and requested the assistance of any qualified medical personnel who might be on board.

12. A physician and an emergency medical technician who were passengers immediately responded to the call for help and rushed to Mr. Stone. The physician requested an AED.

13. Flight personnel quickly secured the plane's emergency medical kit and presented it to the physician just she was arriving at Mr. Stone's row of seats.

14. Unfortunately, that emergency medical kit, like the emergency medical kits on other Frontier flights, contained neither an AED nor any other medical device or drug capable of treating cardiac arrests.

245093

15. Despite the extraordinary efforts of the physician and emergency medical technician, Mr. Stone died.

16. Had the emergency medical kit on Flight 419 been equipped with an AED, the physician, the medical technician, or a trained flight attendant would have saved Mr. Stone's life.

17. As a common carrier of passengers for hire, Frontier owed its passengers a duty of utmost care and vigilance in eliminating risks to them. Frontier had a duty to use the best precautions known to common carriers who keep abreast of modern improvements in such precautions.

18. Frontier represented to its passengers and to the traveling public that it would use its best efforts to transport them safely to their destinations.

19. As an entity which undertook to provide assistance for passengers suffering medical emergencies on board its planes, Frontier also had a duty not to perform that care in a negligent manner.

20. Although the medical emergency kit on-board Flight 419 may have complied with certain minimum requirements set by the Federal Aviation Administration, it was inadequate to treat a sudden cardiac event such as that suffered by Mr. Stone.

**AS TO PARAGRAPHS 21 THROUGH 54, PLAINTIFF ALLEGES THAT, WELL BEFORE JULY 27, 2000, FRONTIER WAS AWARE THAT:**

21. Medical emergencies during commercial airline flights in the United States caused hundreds of deaths each year.

22. A high percentage of such deaths were cardiac-related.

23. Reports and data required by the 1998 Aviation Medical Assistance Act, while incomplete, demonstrated that the most commonly observed, serious in-flight medical events were

245093

cardiac in nature and that ventricular fibrillation was the most common form of abnormal heart rhythm.

24. AEDs were effective in saving the lives of airline passengers who suffered in-flight cardiac arrests.

25. As early as 1991, foreign airlines flying in and to the United States had equipped their planes with AEDs.

26. Since November, 1994, AEDs on foreign airline planes and in airline terminals had saved the lives of numerous airline passengers.

27. Since as early as 1992, the American Heart Association and the American Red Cross had targeted airlines for increased deployment of AEDs.

28. Most major domestic long-haul commercial airlines, and many smaller carriers as well, had equipped their planes with AEDs and Enhanced Emergency Medical Kits.

29. In April, 1997, Congress had held hearings on the deployment of AEDs on commercially operated airplanes and that at such hearings family members of passengers who had died as a result of cardiac arrests on commercial airlines, defibrillator manufacturers and others testified in support of legislation calling for deployment of AEDs on domestic flights.

30. Denver, Colorado, where Frontier is headquartered, is one of the principal locations to which intra-continental flights are diverted in the event of medical emergencies.

31. United Airlines had announced, in Denver, as reported in the Denver Post in February of 1998, that it would be deploying AEDs and Enhanced Emergency Medical Kits on all of its flights in the very near future.

32. American Airlines had been deploying AEDs and Enhanced Emergency Medical Kits on its flights since July, 1997 and had saved its first passenger on the ground in February, 1998.

245093

33. In November, 1998, American Airlines personnel had used an AED on board an American Airlines plane to successfully resuscitate a passenger in flight.

34. The plane on which that passenger, Michael Tighe, was flying had been diverted to the Denver International Airport and Mr. Tighe recuperated in a Denver hospital.

35. American Airlines' resuscitation of Mr. Tighe by AED was widely publicized by local and national media outlets, including Denver television stations, newspapers and *People Magazine*.

36. *Aviation News*, an airline industry trade publication, had featured an article on American Airlines' use of AEDs in saving Mr. Tighe on the front page of its January, 1999 issue.

37. By May, 2000, flight attendants and others using AEDs on board American Airlines' planes had resuscitated and saved eleven passengers who had suffered in-flight cardiac events. American had publicized these resuscitations widely.

38. In May, 2000 Dr. David McKenas, American's medical director, had testified before the United States Congress regarding the use of AEDs in saving passenger lives. Some of the survivors had testified as well.

39. Between June, 1996 and September 1999, the *Chicago Tribune* had prominently featured a series of investigative articles by Pulitzer prize-winning reporter John Crewdson that ran under the title "Code Blue".

40. The "Code Blue" articles detailed the long-hidden problem of in-flight emergencies while highlighting the efforts that foreign airlines and, later, domestic carriers, had made to combat them.

41. The June, 1996 "Code Blue" articles quoted several prominent physicians as saying that the deployment of AEDs on planes would save lives.

245093

42. Other newspapers, including *USA Today*, the *Wall Street Journal,* the *Los Angeles Times*, the *Washington Post* and the *New York Times* followed the "Code Blue" series with their own reports concerning deployment and use of AEDs on commercial airplanes.

43. After June, 1996, the national media began to report regularly on the issue.

44. On April 13, 1999, the New York Times published a long feature entitled, "A $3,000 'Fire Extinguisher' To Put Out Heart Attacks", by its respected health reporter, Jane E. Brody, on the need for in flight AEDs.

45. Beginning on August 30, 1999, a major manufacturer of AEDs ran several full page color advertisements in the *Wall Street Journal*, which read as follows:

> Thirty-thousand feet is no place to go into sudden cardiac arrest. That's why Agilent makes a defibrillator powerful enough to restart a heart, portable enough to fit in a seat pocket, and simple enough to use without a medical degree. It's already saved dozens of lives around the world, and now, even above it. Have a safe flight.

46. The same AED manufacturer ran a similarly themed television commercial in major television markets.

47. Congressman Duncan, Chair of the House Aviation Subcommittee, had written the Air Transport Association in May, 1997, urging it to persuade its members to follow the lead of American Airlines voluntarily, in order to avoid a legislative mandate.

48. In December, 1997 the airline industry's chief trade organization, the Air Transport Association, had recommended that its member airlines upgrade their emergency medical kits and, as a first step toward equipping all their planes with AEDs, equip at least 20% of their fleets with them.

49. As early as 1994 and continuing through 1999, mainstream aviation publications, such as the Flight Safety Foundation's "Cabin Crew Safety," had been publishing reports on the prevalence of in-flight cardiac deaths and the efficacy of AEDs, in preventing them.

245093

50. Beginning in 1994 and continuing through 1999, airline safety organizations, such as the Southern California Safety Institute, had been holding seminars attended by industry experts and personnel which highlighted the need for AEDs.

51. Frontier's emergency medical kits were useless to passengers suffering sudden cardiac arrest.

52. Frontier's planes were not properly equipped to address cardiac emergencies involving passengers on its flights.

53. AEDs and other life-saving drugs and devices were necessary additions to its on-board medical kit and that they could be provided at minimal expense.

54. Beginning in the fall of 1997, a major manufacturer of AEDs had offered domestic air carriers a bulk discount on AEDs which, when added to the costs of installing, maintaining and training in their use, lowered their effective price to less than $2,500 per unit.

**PLAINTIFF FURTHER ALLEGES THAT:**

55. On information and belief, Frontier could have equipped its entire fleet with AEDs in 1998 for less than $120,000

56. Frontier's profit for the fiscal year ending March 31, 1999, was $30.6 million.

57. Frontier's profit for the fiscal year ending March 31, 2000 was $27 million.

58. Frontier's profit for the fiscal year ending March 31, 2001 was $54.9 million.

59. Frontier chose not to follow the lead of other airlines and did not carry AEDs on-board its transcontinental flights.

60. Had Frontier equipped Flight 419 with an AED, Brett Stone would have survived the cardiac event which claimed his life.

245093

61. By failing to equip Flight 419 with an AED, Frontier deprived Brett Stone of a substantial chance to survive.

62. Frontier began training its flight crew personnel on the use of AEDs in August 2000.

63. The training and deployment of the equipment on all of its aircraft was completed by January 2001, in approximately six months.

64. In making the announcement of the deployment, in January, 2001, a Frontier spokesman stated that "Frontier takes its customer service and safety responsibilities very seriously, and we believe this is one more way for us to improve our passenger and crew safety and overall service."

## COUNT I
### (Wrongful Death - M.G.L. c. 229, § 2)

65. The plaintiff repeats and realleges her allegations contained in paragraphs 1 through 64 and incorporates them herein by reference.

66. As a direct and proximate result of the negligent conduct of the defendant Frontier Airlines, Inc., resulting in the death of Brett Stone, his survivor incurred funeral expenses and suffered, among other things, the loss of the services, protection, care, assistance, society, companionship, comfort, guidance, counsel, advice, love and expected net income of the decedent.

## CLAIMS FOR RELIEF

WHEREFORE, the plaintiff demands judgment against the defendant, together with interest and cost for damages in the appropriate amounts for:

(1) reasonable funeral and burial expenses of the decedent; and

(2) the fair monetary value of the decedent to the persons entitled to receive any damages recovered, including, but not limited to, compensation for the loss of reasonably

245093

expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counseling, advice of the decedent as provided by M.G.L. c. 229, § 2 as amended.

## COUNT II
### (Gross Negligence Resulting In Wrongful Death - M.G.L. c. 229, § 2)

67. The plaintiff repeats and realleges her allegations contained in paragraphs 1 through 66 and incorporates them herein by reference. Frontier knew that passengers would suffer sudden cardiac arrest on-board planes, that they had experienced such sudden cardiac arrests in the past, and would experience them in the future.

68. The most serious in-flight medical emergency faced by Frontier, and other commercial airlines, was that individuals would go into sudden cardiac arrest on-board their flights. Frontier knew that this was its most serious problem yet never devised a strategy to address this problem. Frontier knew that if it did not equip its planes with AEDs, passengers suffering sudden cardiac arrest on board its planes would die.

69. As a direct and proximate result of the conduct of Frontier, resulting in the death of Brett Stone, his survivor incurred funeral expenses and suffered, among other things, a loss of the services, protection, care, assistance, society, companionship, comfort, guidance, counsel, advice, love and expected net income of the decedent.

70. Frontier acted, and failed to act, respecting its legal duty to the plaintiff's decedent.. Such acts or omissions were of an aggravated character showing the absence of even slight diligence, and the want of even scant care for passengers. Frontier showed indifference to its legal duty to provide the highest degree of care to its passengers in utter disregard of its legal obligations.

245093

## CLAIMS FOR RELIEF

WHEREFORE, the plaintiff demands judgment against the defendant, together with interest and cost for damages in the appropriate amounts for:

(1) reasonable funeral and burial expenses of the decedent;

(2) the fair monetary value of the decedent to the persons entitled to receive any damages recovered, including, but not limited to, compensation for the loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counseling, advice of the decedent as provided by M.G.L. c. 229, § 2 as amended; and

(3) punitive damages in an amount sufficient to punish Frontier Airlines for its conduct and to deter it from future lapses of its duty of care to its passengers.

## COUNT III
### (Wrongful Death - Reckless Conduct In Violation Of M.G.L. c. 229, § 2)

71. The plaintiff repeats and realleges her allegations contained in paragraphs 1 through 72 and incorporates them herein by reference.

72. Frontier knew, or should have known, for years before Brett Stone's death, that its failure to provide proper emergency medical equipment, including AEDs, involved a high degree of probability that death would result to any individual who was stricken with a sudden cardiac arrest on-board one of its planes. Such a risk of death was a known or obvious one, yet Frontier recklessly and intentionally persisted in conduct which failed to address the problem of sudden cardiac arrests and other cardiac emergencies on-board its airliners. Such conduct was reckless.

245093

## CLAIMS FOR RELIEF

WHEREFORE, the plaintiff demands judgment against the defendant, together with interest and cost for damages in the appropriate amounts for:

(1) reasonable funeral and burial expenses of the decedent;

(2) the fair monetary value of the decedent to the persons entitled to receive any damages recovered, including, but not limited to, compensation for the loss of reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counseling, advice of the decedent as provided by M.G.L. c. 229, § 2 as amended; and

(3) punitive damages in an amount sufficient to punish United Airlines for its conduct and to deter it from future lapses of its duty of care to its passengers.

## COUNT IV
## (M.G.L. c. 93A)

73. The plaintiff repeats and realleges her allegations contained in paragraphs 1 through 72 and incorporates them herein by reference.

74. At all times pertinent hereto, Frontier was engaged in Trade or Commerce.

75. By its conduct, as set forth above, Frontier committed unfair acts or practices in violation of M.G.L. c. 93A, §§ 2 and 9.

76. Said violations were willful.

77. A Demand for Relief was mailed to Frontier on August 15, 2001.

78. Frontier has failed and refused to make a reasonable, good-faith tender of settlement in response.

WHEREFORE, the plaintiff demands judgment against the defendant together with interests and attorney's fees and costs incurred. Plaintiff also demands treble damages on

245093

account of the willful violation of c. 93A and such other relief as this Court deems just and proper.

## COUNT V
### (Negligent Infliction of Emotional Distress - Individual Claim of Christine Stone)

79. The plaintiff repeats and realleges her allegations contained in paragraphs 1 through 64 and incorporates them herein by reference.

80. As a result of the negligence of defendant Frontier, Christine Stone suffered emotional distress, with physical symptoms thereof, when her husband died in her presence.

WHEREFORE, the plaintiff demands judgment against the defendant in an amount sufficient to compensate her for her injuries, together with such other relief as this Court deems proper.

THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES WHICH ARE SO TRIABLE.

THE PLAINTIFF
CHRISTINE STONE, AS
ADMINISTRATRIX
OF THE ESTATE OF BRETT STONE,
By Her Attorneys,

Ronald C. Kidd, Esquire
BBO No. 270720

Paul S. Weinberg, Esquire,
BBO No.: 519550
both of
Robinson Donovan Madden & Barry, P.C.
1500 Main Street, Suite 1600
Springfield, MA 01115
Phone (413) 732-2301  Fax (413) 785-4658

245093