UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CHRISTINE STONE, as Administratix of the Estate of BRETT STONE and Individually, | ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 01-11817-WGY |
| v. | ) ) | |
| FRONTIER AIRLINES, INC., | ) ) | |
| Defendant. | ) ) ) | |

MEMORANDUM AND ORDER

YOUNG, C.J.                                        April 17, 2002

[T]he Constitution professed to solve what was an apparently insoluble political problem. . . . [I]t purported to create a consolidated federal government with powers sufficient to coerce obedience to national laws -- in effect, to discipline a truly continental union -- while remaining true to the republican principles of 1776.  At least logically, this was an impossibility, since the core impulse of these republican principles, the original "spirit of '76," was an instinctive aversion to coercive political power of any sort and a thoroughgoing dread of the inevitable corruptions that result when unseen rulers congregate in distant places. . . . Critics of the Constitution, then and now, have condemned it as a betrayal of the core principles of the American Revolution. . . . Strictly speaking, they were and are historically correct.  Defenders of the Constitution, then and now, have saluted it as a sensible accommodation of liberty to power and a realistic compromise with the requirements of a national domain.  That has turned out, over time, to be correct. . . .

1

DOCKETED



Joseph J. Ellis, Founding Brothers, 9 (2000).

One aspect of this "realistic compromise" is the doctrine of preemption: the supplanting of state law by federal law. "Congress's power to preempt state law derives from the Supremacy Clause of Article VI of the Constitution." French v. Pan Am Express, Inc. 869 F.2d 1, 1 (1st Cir. 1989) (internal citations omitted). Preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." Morales v. Trans World Airlines Inc., 504 U.S. 374, 383 (1992) (internal citation omitted) (emphasis added).

This is all well and good. Unfortunately, in today's mature -- some would say overly-complex -- legal landscape, virtually any federal legislation carries implications for existing state law and requires analysis of the preemption doctrine. In recent years, many commentators have decried what they perceive as the Supreme Court's expansive implied preemption jurisprudence. See, e.g., Caleb Nelson, Preemption, 86 Va. L. Rev. 225, 229 (2000) (noting that "conservative advocates of federalism and liberal advocates of government regulation have joined in arguing that the current tests for preemption risk displacing too much state law"); Betsy J. Grey, Make Congress Speak Clearly: Federal Preemption of State Tort Remedies, 77 B.U. L. Rev. 559, 561 (1997) (commenting that "corporations have attempted to turn

[federal statutes] from regulatory swords into private shields");
Donald P. Rothschild, *A Proposed "Tonic" with Florida Lime to
Celebrate Our New Federalism: How to Deal with the "Headache" of
Preemption*, 38 U. Miami L. Rev. 829, 830 n.3 (1984) (noting that
"present preemption doctrines interfere with a state's right to
supplement federal regulation in order to afford greater
protection for citizens residing within its borders"); <u>see also</u>
Judith Resnik, *Constricting Remedies: The Rehnquist Judiciary,
Congress, and Federal Power*, 78 Ind. L.J. 223, 309 n.460 (2003)
(noting that a majority of the federal judiciary has been willing
to override state law in preemption cases).  Indeed, the Supreme
Court has gone so far as to preempt an older federal civil rights
statute with more restrictive, but recent, federal statutes.
<u>Middlesex County Sewerage Authority</u> v. <u>Nat'l Sea Clammers Ass'n</u>,
453 U.S. 1, 20 (1981) (holding a section 1983 action precluded by
the Marine Protection, Research and Sanctuaries Act and the
Federal Water Pollution Control Act); <u>Smith</u> v. <u>Robinson</u>, 468 U.S.
992, 1011-13 (1984) (section 1983 action precluded by the
Education of the Handicapped Act) (superseded by Education of the
Handicapped Act § 615(e) as amended); <u>see also</u> <u>Canty</u> v. <u>Old
Rochester School Dist.</u>, 54 F. Supp. 2d 66, 73-77 (D. Mass. 1999)
(discussing these two decisions critically).

The sweep of the Supreme Court's implied preemption doctrine
is of particular concern to Congress because Congress' focus is

3

necessarily on the issue sought to be remedied by a pending bill,
not on the unintended consequences for existing state and federal
legislation.   Indeed, even express Congressional disclaimers of
preemptive effect have proven ineffective in light of this
jurisprudence.   See, e.g., Geier v. American Honda Motor Co,
Inc., 529 U.S. 861, 867-68 (2000) (holding that federal
transportation statute preempted state tort claim, despite a
"savings clause" that stated that the federal law "does not
exempt any person from any liability under common law"); Frank v.
Delta Airlines, Inc., 314 F.3d 195, 199 n.6, 201. (5th Cir. 2002)
(holding that federal statute respecting drug testing of airline
employees preempted a terminated employee's state tort claims
against his employer); National Audobon Society, Inc. v. Davis,
307 F.3d 835, 854 (9th Cir. 2002) (holding that federal wildlife
preservation law preempted state preservation law despite
statutory savings clause); Fireman's Fund Ins. Co., v. City of
Lodi, 302 F.3d 928, 952 (9th Cir. 2002) (holding that federal
environmental waste cleanup statute preempted local law, despite
statutory savings clause); Macfarlane v. Canadian Pacific Ry.
Co., 278 F.3d 54, 59 (2d Cir. 2002) (holding that federal railway
safety statute preempted state tort law, despite statutory
savings clause).

      So it is that, in this case, what once was a central issue
of the common law of torts, see, e.g., The T.J. Hooper, 60 F.2d

                                    4

737 (2d Cir. 1932) (L. Hand, J.); W. Page Keeton, et. al.,
Prosser & Keeton on Torts 194 (5th ed. 1984) (citing The T.J.
Hooper for the proposition that an industry "cannot be permitted
to set its own uncontrolled standard[s]" of care), and thus
committed to the wisdom of the nation's juries, must now first be
addressed by a judge to see whether Congress, inadvertently or
not, has once more restricted recovery under state tort law.

I.   **BACKGROUND**

   A.   **Facts**

   A young man, full of promise, died of cardiac arrest aboard
an airplane operated by Frontier Airlines ("Frontier"), whose
planes were not equipped with Automatic External Defibrillators
("defibrillators") at the time.  That man, Brett Stone ("Mr.
Stone"), was 28 years old, a NCAA record holder in swimming, and
a successful venture capitalist.  Compl. ¶ 4.  He had been
accepted into the Harvard Business School, where he planned to
matriculate in January, 2001.  Id. ¶ 5.

   On July 27, 2000, Mr. Stone and his wife, Christine ("Mrs.
Stone"), were aboard Frontier Flight 419, originating from
Boston, heading for vacation in San Francisco.  Id. ¶¶ 7-8.
While in the air, Mr. Stone suffered a cardiac rhythm disturbance
that resulted in cardiac arrest.  Id. ¶ 9.  Mrs. Stone, having
recognized her husband's distress, immediately alerted a flight
attendant.  Id. ¶ 10.  The attendant requested the assistance of

any qualified medical personnel, and a physician and an emergency medical technician -- who were passengers aboard the flight -- promptly attended to Mr. Stone.  Id. ¶¶ 11-12.  The physician then requested a defibrillator.  Id. ¶ 12.  The plane's emergency medical kit, however, contained neither a defibrillator nor any other medical device or drug capable of treating cardiac arrest. Id. ¶ 14.  Despite the extraordinary efforts of the physician and emergency medical technician, Mr. Stone died.  Id. ¶ 15.

According to Mrs. Stone, at the time of Mr. Stone's death, Frontier was on notice as to the wide use and effectiveness of defibrillators for in-flight cardiac arrests.  A summary of the ways in which Frontier was allegedly on notice follows:

### 1.    General Awareness

Medical emergencies during commercial airline flights in the United States cause hundreds of deaths each year and a high percentage of such deaths are cardiac-related.  Id. ¶¶ 21-22. According to the reports and data collected under the Aviation Medical Assistance Act of 1998 ("Medical Assistance Act"), while incomplete, the most commonly observed serious in-flight medical events are cardiac in nature, with ventricular fibrillation being the most common form of abnormal heart rhythm.  Id. ¶ 23.

### 2.    Defibrillator Deployment and Use by Other Carriers

As early as 1991, foreign airlines flying in the United States had equipped their planes with defibrillators.  Id. ¶ 25.

Defibrillators have been effective in saving the lives of numerous passengers on foreign carriers and at airline terminals since November 1994.  Id. ¶ 26.  Since 1992, the American Heart Association and the American Red Cross have targeted airlines for increased deployment of defibrillators.  Id. ¶ 27.  By the time of Mr. Stone's death, most major domestic long-distance commercial airlines and many smaller carriers had equipped their planes with defibrillators and Enhanced Emergency Medical Kits.  Id. ¶ 28.  In April 1997, Congress held hearings on the deployment of defibrillators on commercially operated airplanes; those hearings included testimony from family members of cardiac arrest victim passengers, as well as from defibrillator manufacturers.  Id. ¶ 29.  American Airlines had been deploying defibrillators on its flights since July, 1997.  Id. ¶ 32. American saved its first passenger in February 1998 and saved another in November of the same year.  Id. ¶¶ 32, 33.  The latter incident was widely publicized by the local and national media including Denver television stations, People Magazine, and Aviation News.  Id. ¶¶ 35-36.  By May 2000, eleven passengers had been resuscitated successfully through the use of defibrillators on board American Airlines planes.  Id. ¶ 37.  United Airlines had also announced, as reported in the Denver Post in February 1998, its plan to deploy defibrillators and Enhanced Emergency

7

Medical Kits on all of its flights in the very near future.  Id.
¶ 31.

### 3.    Awareness within the Industry and News Media

In the second half of 1996, the national media began to
report regularly on the use and deployment of defibrillators.
Id. ¶ 43.  Major newspapers -- including the Wall Street Journal,
the Los Angeles Times, the Washington Post, and the New York
Times -- also began publishing reports regarding the issue.  Id.
¶¶ 41-43.  The effectiveness of defibrillators was discussed in
one of a series of prominently featured investigative articles
published by the Chicago Tribune Pulitzer prize-winning reporter
John Crewdson between 1996 and 1999.  Id. ¶¶ 39-41.  In May 1997,
the Chair of the House Aviation Subcommittee wrote to the Air
Transport Association (the airline industry's chief trade
organization), urging it to persuade its members voluntarily to
equip their planes with defibrillators in order to avoid a
legislative mandate.  Id. ¶ 47.  In December, 1997, the Air
Transport Association recommended that its member airlines
upgrade their emergency medical kits and -- as a first step
toward equipping all their planes with defibrillators -- equip at
least 20% of their fleets with them.  Id. ¶ 48.  Beginning August
30, 1999, a major defibrillator manufacturer ran several full-
page color advertisements in the Wall Street Journal claiming
that its product had already saved dozens of lives.  Id. ¶ 45.

From 1994 through 1999, mainstream aviation publications, including the Flight Safety Foundation's "Cabin Crew Safety," published reports on the prevalence of in-flight cardiac deaths and the effectiveness of defibrillators in preventing them. Id. ¶ 49. Beginning in 1994 and continuing through 1999, seminars were held by airline safety organizations, such as the Southern California Safety Institute, which highlighted the need for defibrillators. Id. ¶50. In May 2000, the American Airlines medical director, as well as passengers who had survived because of the presence of defibrillators on board, testified before Congress regarding the use of defibrillators in saving passengers' lives. Id. ¶ 38.

### 4.  Emergency Medical Kits and Cost for Defibrillator Deployment

Mrs. Stone alleges that Frontier's emergency medical kits were useless to passengers suffering sudden cardiac arrests and that Frontier's planes were not properly equipped to address cardiac emergencies involving its passengers. Id. ¶¶ 51-52. Defibrillators and other life-saving drugs and devices were necessary additions to its on-board medical kit that could have been provided at minimal expense, Mrs. Stone contends, especially after a major defibrillator manufacturer started offering domestic carriers a bulk discount on defibrillators, lowering their effective price to less than $2,500 per unit (including installation, maintenance, and training). Id. ¶¶ 53-54.

Frontier's defibrillator installation cost for its entire fleet in 1998 would have been less than $120,000, while it made a profit of $30,600,000 for the 1999 fiscal year, $27,000,000 for 2000, and $54,900,000 for 2001.  Id. ¶¶ 55-59.  Mrs. Stone claims that Frontier's failure to equip Flight 419 with a defibrillator deprived Mr. Stone of a substantial chance to survive.  Id. ¶ 61. In January, 2001, Frontier completed the deployment of defibrillators throughout its entire fleet and the requisite training for its flight crews.  Id. ¶ 63.

### B.  Procedural Posture

After Mr. Stone's death, Mrs. Stone filed the instant complaint against Frontier in her individual capacity and as the administrator of Mr. Stone's estate.  Because Mrs. Stone is a Massachusetts resident and Frontier is a Delaware corporation with a principal place of business in Denver, Colorado, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  Mrs. Stone's complaint raises the following five state law claims: (1) Wrongful Death pursuant to Mass. Gen. Laws ch. 229, § 2; (2) Gross Negligence Resulting in Wrongful Death pursuant to Mass. Gen. Laws ch. 229, § 2; (3) Reckless Conduct Resulting in Wrongful Death pursuant to Mass. Gen. Laws. ch. 229, § 2; (4) Unfair Acts and Practices in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 9; and (5) negligent infliction of emotional

10

distress (with respect only to Mrs. Stone in her individual capacity).

Frontier subsequently moved for the dismissal of the complaint in its entirety under theories of preemption and the dormant Commerce Clause [Docket No. 15]. The Court held a hearing on this motion and subsequently took it under advisement. On December 2, 2002, the Court issued an order granting Frontier's motion to dismiss as to Count IV (the 93A claim) and denying it as to the remaining four claims. Frontier has subsequently moved for reconsideration of the Court's denial of its motion to dismiss Counts I, II, III, and V, or, in the alternative, for certification of the Court's December 2, 2002 order for interlocutory appeal [Docket No. 38].

The following discussion serves to explain the basis of the Court's December 2, 2002 order and, simultaneously, to address Frontier's motion for reconsideration.

## II.   DISCUSSION

A motion to dismiss can be granted only if the well-pleaded facts, taken as true, cannot justify recovery under any supportable legal theory. See Cruz v. Melecio, 204 F.3d 14, 21-22 (1st Cir. 2000). Thus, in considering Frontier's motion to dismiss as well as its motion for reconsideration, the Court has accepted Mrs. Stone's allegations as true and has drawn all reasonable inferences in her favor. See id.

11

**A.   Preemption**

Frontier contends, in both its motion to dismiss and its motion for reconsideration, that Mrs. Stone's claims are preempted.  As stated above, federal law may preempt state law either explicitly or implicitly.  Morales, 504 U.S. at 383.  The Court first discusses the relevant federal aviation law and then evaluates whether that body of law explicitly or implicitly preempts Mrs. Stone's claims.

**1.   Federal Aviation Law**

The Federal Aviation Act ("Aviation Act") of 1958 gave the executive branch the "authority to regulate interstate airfares and to take administrative action against certain deceptive trade practices."  Morales, 504 U.S. at 378.  The statute -- formerly 49 U.S.C. App. § 1506 -- also provides that "[a] remedy under this part [49 U.S.C. § 40101 et. seq.] is in addition to any other remedies provided by law."  49 U.S.C. § 40120(c)(2002).

In 1978, Congress promulgated the Airline Deregulation Act ("Deregulation Act") to promote "efficiency, innovation and low prices as well as variety [and] quality . . . of air transportation services" through "maximum reliance on competitive market forces."  Morales, 504 U.S. at 378, citing 49 U.S.C. App. §§ 1302(a)(4), 1302(a)(9).  The Deregulation Act included an explicit preemption clause that reads: "[A] State . . . may not enact or enforce any law, regulation, or other provision having

12

the force and effect of law related to a price, route, or service
of any air carrier that may provide air transportation under this
subpart."  49 U.S.C. § 41713(b)(1) (2002) (previously 49 U.S.C.
App. § 1305(a)(1)).[1]

The Aviation Act also contains a savings clause.  See
Morales, 504 U.S. at 384 (citing 49 U.S.C. App. § 1506).[2]
Furthermore, subsection 41713 preserves the proprietary powers
and rights of "a State, political subdivision of a State, or
political authority of at least two States that owns or operates
an airport."  49 U.S.C. § 41713(b)(3) (previously 49 U.S.C. App.
§ 1305(b)(1)).

Federal law specifically addressing aviation safety also
exists.  Under the Aviation Act, Congress entrusted the
Administrator of the Federal Aviation Administration ("FAA") with

---

[1] Section 1305(a)(1) provides that "No State or political
subdivision thereof and no interstate agency or other political
agency of two or more States shall enact or enforce any law,
rule, regulation, standard, or other provision having the force
and effect of law relating to the rates, routes, or service of
any air carrier . . . ."  This section was amended and
incorporated into the Federal Aviation Administration
Authorization Act of 1994.  Charas v. Trans World Airlines, Inc.
160 F.3d 1259, 1262 (9th Cir. 1998).  The "revisions were not
meant to be substantive."  Somes v. United Airlines, Inc. 33 F.
Supp. 2d 78, 81 n.1 (D. Mass. 1999) (Lasker, J.), citing American
Airlines, Inc. v. Wolens, 513 U.S. 219, 223 n.1 (1995).
Accordingly, this opinion assumes interchangeability of the terms
used in the two statutes, particularly since both parties use
terms in the previous statute.

[2] This provision was re-enacted, without substantive change, at
49 U.S.C. § 40120(c).  See, e.g., Sam L. Majors Jewelers v. ABX,
Inc., 117 F.3d 922, 928 n.13 (5th Cir. 1997).

13

the promotion of safe flight of civil air craft in air commerce by prescribing "regulations and minimum standards for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce . . . ." 49 U.S.C. § 44701(a)(5). In 1998, Congress promulgated the Aviation Medical Assistance Act ("Medical Assistance Act"), Pub. L. No. 105-170 § 2, 112 Stat. 47, which mandated that the Administrator "determine whether current minimum requirements for air carrier crewmember medical emergency training and air carrier emergency medical equipment should be modified." 65 Fed. Reg. 33720 (proposed May 24, 2000). The Medical Assistance Act also required the Administrator to determine whether to require defibrillators on passenger aircraft and at airports. Id.

The FAA published a notice of proposed rule-making on May 24, 2000, soliciting comments from the public. Id. On April 12, 2001, subsequent to an extensive review of comments received, the FAA issued a final rule requiring "airplanes [on] which a flight attendant is required and with a maximum payload capacity of more than 7,500 pounds [to carry] an approved automated external defibrillator as of April 12, 2004." 66 Fed. Reg. 19028 (April 12, 2001) (to be codified as 14 C.F.R. §§ 121.803-805, 121-303, 309, 323, 325, 415, 417, 427, 135.177).

The Medical Assistance Act also contains a section entitled "Limitations on liability," which (1) eliminates the liability of

14

an airline arising from in-flight medical assistance provided by

a "good Samaritan"; and (2) limits the liability of any

individual in providing medical assistance aboard an aircraft.

The good Samaritan clause provides:

> An air carrier shall not be liable for damages in any action
> brought in a Federal or State court arising out of the
> performance of the air carrier in obtaining or attempting to
> obtain the assistance of a passenger in and in-flight
> medical emergency . . . if the passenger is not an employee
> or agent of the carrier and the carrier in good faith
> believes that the passenger is a medically qualified
> individual.

Pub. L. No. 105-170 § 5(a), 112 Stat. 47.  The second clause on

individual liability provides:

> An individual shall not be liable for damages in any action
> brought in a Federal or State court arising out of the acts
> or omissions of the individual in providing or attempting to
> provide assistance in the case of an in-flight medical
> emergency unless, the individual, while rendering such
> assistance, is guilty of gross negligence or willful
> misconduct.

Pub. L. No. 105-170 § 5(b), 112 Stat. 47.

With respect to federalism and preemption, the FAA

determined, "under the principles . . . of Federalism," that:

> this action will not have a substantial direct effect on the
> States, or the relationship between the national Government
> and the States, or on the distribution of power and
> responsibilities among the various levels  of government.
> Therefore, we determined that this final rule does not have
> federalism implications.

66 Fed. Reg. at 19043.

Frontier argues that these federal statutes and regulations preempt Mrs. Stone's lawsuit explicitly and implicitly. The Court considers each contention in turn.

### 2. Express Preemption

Frontier has contended that the Deregulation Act, which prohibits states from enacting or enforcing laws that relate to the price, route, or service of air carriers, explicitly preempts Mrs. Stone's claims. Federal courts address claims of preemption with the presumption that Congress does not intend to supplant state law. New York Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654 (1995). When considering whether federal law preempts state law, courts must "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Morales, 504 U.S. at 383 (internal citations omitted). As noted above, the Deregulation Act does explicitly preempt state law "related to a price, route, or service of any air carrier that may provide air transportation . . . ." 49 U.S.C. § 41713(b)(1)(2002) (emphasis added). The Supreme Court has construed this preemption clause broadly and has defined "related to" as "having a connection with or reference to airline 'rates, routes, or services' . . . ." Morales, 504 U.S. at 384.

16

Because the Supreme Court has defined "related to" so broadly, the question here becomes whether state tort claims based on the negligent failure to provide defibrillators relate to a "service," as defined in the preemption clause of the statute.  Neither the Supreme Court[3] nor the First Circuit[4] has defined the term "service."[5]  A court in this District, however, has held -- in a case with facts almost identical to the case at bar -- that "the provision of emergency medical equipment to treat in-flight medical emergencies unrelated to the actual

_____

[3] In Morales, the Supreme Court held that the Deregulation Act expressly preempted state guidelines respecting airline fare advertising because the guidelines in question in that case related to "fares," as contained in the preemption clause. Morales, 504 U.S. at 391.  Similarly, in American Airlines, Inc. v. Wolens, the Court held that the statute preempted claims based on state consumer fraud and consumer protection statutes when those claims arose from complaints about airline fares, frequent flier programs, and promotional programs.  513 U.S. 219, 228 (1995).

[4] The First Circuit has held only generally that (1) Puerto Rico's statutory scheme prohibiting interstate carriers from making deliveries without either prior proof of recipient's payment of territorial excise tax or carrier's compliance with a complex procedure for documenting carrier's reimbursable payment of tax "both refers to and has a forbidden significant effect on UPS's prices, routes or services," United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 335 (1st Cir. 2003); and (2) that the Deregulation Act preempted state regulation of pilot qualification, without a discussion of the term "services." French v. Pan Am Express, Inc., 869 F.2d 1, 5 (1st Cir. 1989).

[5] See, however, this Court's decision in Doricent v. American Airlines, No. CIV.A.91-12084-Y, 1993 WL 437670 at *5 (D. Mass. Oct. 19, 1993), which discusses the difficulty of construing the phrase "relating to" and holds that claims of racial discrimination, the intentional infliction of emotional distress, and assault and battery do not implicate airline "services."

17

operation of the aircraft is categorically distinct from the 'services' Congress had in mind when it adopted the [Deregulation Act's] preemption provision." Somes v. United Airlines, Inc., 33 F. Supp. 2d 78, 83 (D. Mass. 1999) (Lasker, J.).

In Somes, the court reasoned that placement of the word "services" next to the terms "rates" and "routes" suggests that "the congressional purpose was simply to preempt and safeguard the actual transportation service an airline provides to passengers." Id. Such reasoning is consonant with the venerable *noscitur a sociis* canon of statutory construction, which instructs that "the meaning of an unclear word or phrase should be determined by the words immediately surrounding it." Black's Law Dictionary 1084 (7th ed. 1999); see, e.g., Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961) ("The maxim *noscitur a sociis*, . . . while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the unintended giving of breadth to Acts of Congress."); see also Gustafson v. Alloyd Co., 513 U.S. 561, 575 (1995) (holding that "a word is known by the company it keeps"). To interpret the term "services" more broadly than did the Somes court would not merely violate this canon of construction, but would envelop the words "rates" and "routes" and render them superfluous, yet another heretical deed within the secular creed of statutory construction. See, e.g., Platt v. Union Pacific R.

18

Co., 99 U.S. 48, 58 (1879) (holding that "a legislature is presumed to have used no superfluous words"). Superfluity would ensue here because "services," under a broad definition, would necessarily include the cost ("rates") and methods ("routes") of service.

Moreover, the Fifth and Ninth Circuits have also suggested that the provision of a defibrillator or other equipment for treating in-flight medical emergencies is not encompassed under "services." In Hodges v. Delta Airlines, Inc., the Fifth Circuit held that:

> Services generally represent a bargained-for or anticipated provision of labor from one party to another . . . Elements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself.

44 F.3d 334, 336 (5th Cir. 1995) (en banc). The Ninth Circuit similarly held that "services" refers to "the prices, schedules, origins, and destinations of the point-to-point transportation of passengers, cargo or mail," but not to "an airline's provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1261 (9th Cir. 1998) (en banc). In both cases, the circuit courts held that the federal

statute did not expressly preempt private state law tort claims. <u>Hodges</u>, 44 F.3d at 336; <u>Charas</u>, 160 F.3d at 1266.[6]

Whether utilizing the Fifth or Ninth Circuit's definition of services, neither construction "support[s] the contention that Congress, by use of the term 'services,' intended to preempt any state law duty relating to in-flight emergency medical kits." <u>Somes</u>, 33 F. Supp. 2d at 83-84.  Providing emergency medical equipment does not inhere in the nature of an airline's operations and is not typically a "bargained-for or anticipated service."  <u>Id.</u> at 83.  Indeed, emergency medical equipment is not usually provided in the normal course of transporting passengers.

Moreover, various other provisions of the Deregulation Act and its legislative history -- as deftly outlined by the courts in <u>Somes</u>, <u>Hodges</u>, and <u>Charas</u> -- support the conclusion that state tort claims are not preempted.  For example, the statute requires airlines to maintain insurance or self-insurance.  49 U.S.C. § 41112(a) (2000).  Such a requirement would be purposeless unless Congress intended state tort actions to survive.  <u>Charas</u>, 160

---

[6] Frontier relies on <u>Howard</u> v. <u>Northwest Airlines</u>, 793 F. Supp. 129 (S.D. Tex. 1992), but the case is distinguishable.  That case concerned a state tort action wherein the airline was asked to provide assistance to facilitate the decedent-passenger's <u>transfer</u> at a lay-over airport.  <u>Id.</u> at 130.  Such mundane procedure is a typical airline service unlike the personal in-flight medical needs of a passenger presented by the instant case.  In any case, to the extent the holding and reasoning in <u>Howard</u> does not comport with this Court's reasoning, this Court is not bound by that decision and chooses not to follow the reasoning therein.

F.3d at 1265; <u>Hodges</u>, 44 F.3d at 338; <u>accord</u> <u>Somes</u>, 33 F. Supp. at 84.

In addition, the retention of the "savings clause" in the statute also suggests that Congress did not intend to preempt state personal injury actions, notwithstanding the Supreme Court's characterization of the clause as a "relic." <u>Morales</u>, 504 U.S. at 385. Indeed, even the Supreme Court suggested in <u>Wolens</u> that state tort actions are not expressly preempted by the statute. The <u>Wolens</u> Court noted that the defendant airline "[did] not urge that the [Deregulation Act] preempts personal injury claims relating to airline operations," and specifically cited the defendant's brief, which acknowledged that "'safety claims,' for example, a negligence claim arising out of a plane crash, 'would generally not be preempted.'" <u>Wolens</u>, 513 U.S. at 231 n.7; <u>see also</u> <u>id.</u> at 236 (Stevens, J. dissenting) (noting that "[p]resumably . . . the majority [in <u>Wolens</u>] would not hold all common-law negligence rules to be pre-empted by the [Deregulation Act]"). As the Supreme Court has held in a related preemption context, "[i]t would have been perfectly rational for Congress not to pre-empt common-law claims, which -- unlike most administrative and legislative regulations -- necessarily perform an important remedial role in compensating accident victims." <u>Sprietsma</u> v. <u>Mercury Marine</u>,, 123 S. Ct. 518, 527 (2002). While perhaps not overly broad, the savings clause "assumes that there

21

are some significant number of common-law liability cases to save
[and the] language of the pre-emption provision permits a narrow
reading that excludes common-law actions." Geier, 529 U.S. at
868 (describing a similar savings clause in a different statute).

Finally, the fact that the Deregulation Act does not contain
a remedy for personal injury claims also buttresses the inference
that Congress intended state tort actions to persist. In Hodges,
the Fifth Circuit stated that "[i]t is difficult to believe that
Congress would, without comment, remove all means of judicial
recourse for those injured by illegal conduct." 44 F.3d at 338,
quoting Silkwood v. Kerr-Mcgee Corp., 464 U.S. 238, 251 (1984);
accord Somes, 33 F. Supp. 2d at 84. This Court will not
interpolate such an intent here.

Requiring airlines to carry more sophisticated emergency
medical equipment is distinct from the "services" referred to by
Congress in the preemption provision of the Deregulation Act.
Therefore, the statute does not expressly preempt Mrs. Stone's
state law tort claims.

### 3.    Implied Preemption

In addition to its argument that the Deregulation Act
explicitly preempts Mrs. Stone's claims, Frontier has also argued
that the Deregulation Act, the Aviation Act, and the FAA
regulations impliedly preempt those claims. Although a statute
may not expressly preempt state law, it may do so impliedly. A

22

federal statute implicitly preempts state law either when the
scope of a statute demonstrates that "Congress intended to occupy
a field exclusively, or when a state law is in actual conflict
with federal law." Sprietsma, 123 S. Ct. at 527 (internal
citations and quotation marks omitted). Courts are not bound by
the "'rigidly distinct' preemption categories" of field
preemption and conflict preemption, though the classifications
often provide a useful framework. See Phillip Morris v.
Harshbarger, 122 F.3d 58, 86 n.18 (1st Cir. 1997).
Notwithstanding any classification, implied preemption requires
clear Congressional intent to preempt. Id. at 86.

### a. Field Preemption

To qualify for field preemption, a Congressional scheme must
be so pervasive as to "disallow[] concurrent state operation or
supplementation." Id. at 68. In the instant case, Frontier
argues that Mrs. Stone's claims are trespassing in the
Congressional field of aircraft safety. In support of this
contention, Frontier points to the legislative histories of the
Deregulation Act and the Medical Assistance Act, as well as to
FAA regulations and relevant case law, as evidence of clear
Congressional intent to preempt Mrs. Stone's state law claims.
This Court, however, is unpersuaded.

The relevant statutes and corresponding legislative history
do evince a clear Congressional intent to promote airline safety.

23

In relevant part, the Aviation Act directs the Secretary of
Transportation to "assign[] and maintain[] safety as the highest
priority in air commerce," 49 U.S.C. § 40101(a)(1), and to:

> prevent[] deterioration in established safety procedures,
> recognizing the clear intent, encouragement, and dedication
> of Congress to further the highest degree of safety in air
> transportation and air commerce, and to maintain the safety
> vigilance that . . . has come to be expected by the
> traveling and shipping public . . . .

49 U.S.C. § 40101(a)(3).  The FAA Administrator must "ensure the
safety of the aircraft and the efficient use of airspace," 49
U.S.C. § 40103(b)(1) and is authorized to establish minimum
standards "for other practices, methods, and procedure [the
Administrator] finds necessary for safety in air commerce and
national security."   49 U.S.C. § 44701(a)(5).

Accordingly, the Administrator has exercised this authority
and has promulgated extensive rules and regulations, including
prescriptions concerning "emergency equipment," 14 C.F.R. §
121.309(c), (e); means of evacuation, 14 C.F.R. § 121.310(a);
interior emergency exits, 14 C.F.R. § 121.310(b), (e); and
emergency lighting, 14 C.F.R. § 121.310(d).  In addition, FAA
regulations require aircraft to carry an emergency medical kit
"for treatment of injuries or medical emergencies that might
occur during flight time." 14 C.F.R. § 121.309(d).

The Medical Assistance Act required the FAA Administrator to
"reevaluate regulations regarding: (1) the equipment required to
be carried in medical kits of aircraft operated by air carriers;

and (2) the training required of flight attendants in the use of
such equipment, and, if the Administrator determines that such
regulations should be modified as a result of such reevaluation,
shall issue a notice of proposed rulemaking to modify such
regulations."  Pub. L. 105-170, Section 2, Apr. 24, 1998.  It
also specifically requires the Administrator to decide whether to
require defibrillators on passenger aircraft.  Id.  Section 4.
On April, 12, 2001, the FAA promulgated a rule requiring all
passenger aircraft to carry a defibrillator by April 12, 2004
(the "Final Rule").  66 Fed. Reg. 19044.

Neither the Aviation Act and its corresponding history and
regulations nor the Medical Assistance Act and its corresponding
regulations, however, evince Congressional intent to preempt the
field within which Mrs. Stone's claims fall.  The Supreme Court
has ruled that federal law preempts regulation in the field of
aircraft noise.  City of Burbank v. Lockheed Air Terminal, Inc.,
411 U.S. 624, 633, 639 (1973) (noting that the field of aircraft
noise "require[d] a uniform and exclusive system of federal
regulation if the congressional objectives underlying the Federal
Aviation Act [we]re to be fulfilled").  The First Circuit has
also held that federal law preempts state regulation of pilot
qualification.  French v. Pan Am Express, Inc., 869 F.2d 1, 5
(1st Cir. 1989).  In so holding, the court implicitly suggested
that Congress has preempted the field of "air safety."  Id. ("It

25

is hard to imagine an area of regulation that is more closely related to air safety than pilot qualification.  And local restrictions on pilot qualification would make impossible the attainment of the centralized control and uniformity of design so plainly coveted by the Congress.").

Even if Congress did intend to preempt the field of "air safety," Mrs. Stone's claims do not trespass upon that field. The safety with which Congress was primarily concerned is the operational and functional integrity of an aircraft -- internally and externally -- as it affects passengers and the public.  This is shown by the fact that the statues and regulations in question generally relate to "matters inherent in the nature of airline operations."  Somes, 33 F. Supp. 2d at 87.  Regulation of noise, as in City of Burbank, and regulation of pilot qualification, as in French, address safety as it relates to "the actual transportation of passengers to and from their destinations." Id. (emphasis added).  The independent health and medical needs of individual passengers, by contrast, do not necessarily relate to the integrity of the aircraft.[7]

---

[7] Even the Third Circuit's broad statement in Abdullah v. American Airlines, Inc. finding that "any state or territorial standards of care relating to aviation safety are federally preempted," 181 F.3d 363, 371 (3rd Cir. 1999), arose in the context of a case that involved passenger injuries arising from turbulence, rather than injuries arising from internal, non-flight-related causes.

Of course, Congress has authorized the FAA to prescribe minimum standards of safety within the aircraft, and the FAA has promulgated rules relating to medical kits and now, specifically, rules relating to defibrillators.  A Congressional mandate to the FAA to explore minimum standards of safety and to explore whether to require defibrillators, however, hardly evinces clear intent by Congress to leave no room for states to supplement the "field" of the personal medical needs of passengers.  Indeed, at the time of Mr. Stone's death,[8] the FAA had not yet promulgated the Final Rule requiring aircraft to carry defibrillators by the year 2004. This does not mean, however, airlines should not have already been carrying them by that date under state law.  "Minimum requirements, by definition, permit and authorize the party to whom they apply to exceed the minimum.  Thus [medical] regulations themselves do not bar the airline from carrying supplemental devices to protect its passengers, or state law from requiring more of airlines."  Somes, 33 F. Supp. 2d at 87.

Even if the Final Rule is germane to the analysis here, it does not necessarily support the conclusion that Congress' intent to preempt was clear and manifest.  It is true that preemption of state law may result from a "federal agency acting within the scope of its congressionally delegated authority."  Louisiana

---

[8] Mrs. Stone's claims accrued July 27, 2000 when Mr. Stone died aboard the Frontier aircraft.

Pub. Serv. Comm'n v. F.C.C., 476 U.S. 355, 369 (1986).   The
Supreme Court has also said, however, that [p]reemption should
not be inferred . . . simply because the agency's regulations are
comprehensive."   R.J Reynolds Tobacco Co. v. Durham County, 479
U.S. 130, 149 (1986).   Moreover,

> an agency literally has no power to act, let alone pre-empt
> the validly enacted legislation of a sovereign State, unless
> and until Congress confers power upon it.   Second, the best
> way of determining whether Congress intended the regulations
> of an administrative agency to displace state law is to
> examine the nature and scope of the authority granted by
> Congress to the agency.

Lousisana Pub. Serv. Comm'n, 476 U.S. at 374 (emphasis added).

In other words, FAA rules themselves are not dispositive in
the preemption analysis; rather, the intent of Congress is
paramount.   In this case, Congress passed a law requiring the FAA
to explore the use of defibrillators on aircraft.   Nothing in
that mandate suggested an intent to prescribe particular
standards or potential penalties for non-compliance.   To suggest
that Congress intended to eliminate state tort liability with
such a mandate strains credulity.   Therefore, because Congress'
intent to occupy a field of regulation that encompasses the
personal medical health of passengers is unclear, the Court rules
that Congress occupied no such field, at least as of July 27,
2000.

### b.  Conflict Preemption

Notwithstanding the labels, conflict preemption and field preemption are not necessarily discrete categories of preemption because, as the First Circuit has explained, "implied preemption has a certain protean quality, which renders pigeonholing difficult." French, 869 F.2d at 2.  As such, the "conflict preemption" analysis that follows resonates with the field preemption analysis above.

Implied conflict preemption occurs either where it is "impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Sprietsma, 123 S. Ct. at 527 (internal citations and quotation marks omitted).  If the allegedly preempted action involves matters that the states have traditionally regulated, "congressional intent to supersede state laws must be 'clear and manifest'" before implicit preemption will attach.  Phillip Morris, 122 F.3d at 86; accord Somes, 33 F. Supp. 2d at 85.  This Court holds that the law embodied in Mrs. Stone's state tort claims does not conflict with the relevant federal statutes so as to be preempted.

First, it is not impossible for airlines to comply with both state and federal law.  Prior to April 2001 -- the date upon which the FAA regulation respecting defibrillators became final -

- the airlines were neither prohibited from nor required to carry
defibrillators aboard passenger aircraft; rather, they were
required by the FAA to follow "minimum standards" of safety.
Currently, airlines are required to equip all passenger aircraft
with defibrillators by April 2004.  Neither following "minimum
standards" of safety (under the old regime) nor following the FAA
directive to carry defibrillators (under the new regime)
precludes, in any way, an airline from simultaneously complying
with state tort law standards of negligence, which may also
require airlines to carry defibrillators.  In other words,
Frontier could comply with both federal and state standards --
under any time frame in question -- with respect to
defibrillators.

Second, despite Frontier's protestations, Mrs. Stone's state
tort claims do not portend any obstacle for any Congressional
objectives.  The Supreme Court has held that, although a savings
clause accompanying a preemption clause generally preserves state
tort actions, such a clause does not save tort actions that
"actually conflict[] with a federal safety standard."  Geier, 529
U.S. at 868, 871.  In Geier, the victim of an automobile accident
sued defendant car manufacturer, claiming that the defendant
should have equipped its vehicles with side airbags.  Id. at 865.
A Department of Transportation safety standard, however, provided
manufacturers with a mix of several different passive restraint

systems from which to choose in order to comply with the federal standards that were being phased in over several years. Id. at 878. Moreover, the Department of Transportation had explicitly rejected an "all airbag" standard. Id. at 879. The Court held that any state standard requiring airbags in vehicles was in direct conflict with the federal regulation and was, therefore, preempted. Id. at 886.

Despite Frontier's arguments, Geier is distinguishable from the instant case. Unlike the regulation in Geier, the FAA's rule respecting defibrillators simply requires airlines to carry defibrillators by April, 2004. The rule did not and does not, for example, give airlines the choice between carrying defibrillators or training all flight attendants in cardio-pulminary resuscitation. Rather, the rule is in complete harmony -- not conflict -- with a state negligence standard that might also independently require airlines to carry defibrillators.

Moreover, even assuming the rule creates a conflict now, the rule was not in effect as of July 27, 2000, the date of Mr. Stone's death. At that time the only relevant federal requirements with which airlines were required to comply were the broad and vague "minimum standards" of safety mandated by Congress, including the limited safety regulations promulgated by the FAA. As stated above, however, "[m]inimum requirements, by definition, permit and authorize the party to whom they apply to

exceed the minimum. Thus, the emergency medical kit regulations themselves do not bar the airline from carrying supplemental devices to protect its passengers, or state law from requiring more of airlines." <u>Somes</u>, 33 F. Supp. 2d at 87. Therefore, no conflict existed as of July 27, 2000.[9]

Finally, the regulations themselves suggest that state tort actions should survive. Respecting applicability, the relevant regulation states:

> This subpart prescribes the emergency medical equipment and training requirements applicable to all certificate holders operating passenger-carrying airplanes under this part. <u>Nothing in this subpart is intended</u> to require certificate holders or its agents to provide emergency medical care or <u>to establish a standard of care for the provision of emergency medical care</u>.

66 Fed. Reg. 19044 (emphasis added). This language suggests that state tort law should provide the proper standards of care, thereby implying that state tort actions should survive the regulation. In addition, the rule explicitly limits liability under the regulation. Specifically, it (1) eliminates the

---

[9] Frontier cites <u>Davis</u> v. <u>Brunswick Corp.</u>, 854 F. Supp. 1574, 1580-81 (N.D. Ga. 1993) for the proposition that "the date when preemption begins is the date that the enabling legislation is enacted, not the date the regulations became effective." Def.'s Mot. for Reconsideration at 9. Davis is distinguishable from the instant case, however, because in <u>Davis</u>, the enabling legislation itself explicitly preempted the relevant field within which the plaintiff's claims arose. 854 F. Supp. at 1580-81 ("It is self-evident that where a federal law <u>explicitly</u> <u>preempts</u> a field, it does so at the time it is enacted.") (emphasis added). As discussed above, here the Court has held that there is no explicit preemption.

liability of an airline arising from in-flight medical assistance provided by a "good Samaritan"; and (2) limits the liability of any individual for providing medical assistance aboard an aircraft.  By placing certain limits on liability for failing to comply with the rule, the rule necessarily assumes that some liability may arise, and the most likely form of such liability -- given that the regulation itself authorizes no private right of action -- is state tort liability.

For the foregoing reasons, the Court held, and continues to hold, that Mrs. Stones' first, second, third, and fifth claims are neither explicitly nor implicitly preempted.  By contrast, the Court's dismissal of Mrs. Stone's Chapter 93A claim -- which has not been challenged -- rested on a finding that this claim was indeed preempted.  In Wolens, the Supreme Court held that a state consumer protection act claim was preempted by the Deregulation Act.  Wolens, 513 U.S. at 228.  There, passengers claimed that American Airline's frequent flyer program modifications violated the Illinois Consumer Fraud and Deceptive Business Practices Act.  Id. at 225.   The Illinois statute prohibited "unfair methods of competition and unfair or deceptive acts or practices . . . or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act in the conduct of any trade or commerce . . . ."  815 Ill. Comp. Stat. 505/2.  The Supreme Court thus explained that the

Illinois Consumer Act was "prescriptive" and "control[led] the primary conduct of those falling within its governance." Id. 227. Further, the Court held that "in light of the [Deregulation Act's] preemption clause, and of the [statute's] purpose to leave largely to the airlines themselves, and not at all to States, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services," the Aviation Act preempted the passengers' claim under the Illinois consumer protection statute. Id. at 228.

Mrs. Stone's claim under Chapter 93A presents the same issue. Chapter 93A provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Law ch. 93A §2(a). This language is almost identical to the statute at issue in Wolens. Accordingly, this Court ruled that Count IV of Mrs. Stone's complaint was preempted by the Deregulation Act.

**B.     The Dormant Commerce Clause**

Frontier also argued that Mrs. Stone's state tort claims violate the Commerce Clause and are thus unconstitutional. The Commerce Clause provides that "Congress shall have Power ... [t]o regulate Commerce ... among the several States." U.S. Const., Art. I, § 8. "[T]he Commerce Clause . . . even without implementing legislation by Congress is a limitation upon the power of the State." Edgar v. MITE Corp, 457 U.S. 624, 640

34

(1982) (internal quotation marks omitted); <u>Great Atlantic &</u>
<u>Pacific Tea Co., Inc.</u> v. <u>Cottrell</u>, 424 U.S. 366, 370-371 (1976).
The Commerce Clause prohibits the states from directly regulating
interstate commerce.  <u>MITE</u>, 457 U.S. at 640.  States are,
however, permitted to pass regulations that have incidental
effects on interstate commerce, as long as the regulation
operates "evenhandedly to effectuate a legitimate local public
interest, . . . unless the burden imposed on such commerce is
clearly excessive in relation to the putative local benefits."
<u>Id.</u> (internal citations omitted).  In other words, courts use a
"burden versus benefit" balancing test to determine the
constitutionality of state laws that incidentally affect
interstate commerce.  The same balancing test is used regardless
of whether the state law in question emerges from common law or
directly from a statute or regulation.  <u>Cipollone</u> v. <u>Liggett</u>
<u>Group, Inc.</u>, 505 U.S. 504, 521 (1992).

The question here is thus whether a Massachusetts jury
verdict in Mrs. Stone's favor -- essentially, a verdict imposing
a requirement that airlines carry defibrillators -- would violate
the Commerce Clause by burdening interstate commerce to a degree
that clearly exceeds the local benefits of such a regulation.
The type of local benefit implicated here -- namely, the
protection of Massachusetts citizens' health -- is significant.
Courts have long held that the Commerce Clause does not impair

35

states' authority to establish reasonable regulations for the protection of the health, lives, and safety of the people within their borders. New York, New Haven & Hartford R.R. Co. v. New York, 165 U.S. 628, 631 (1897) (Harlan, J.); General Motors Corp. v. Tracy, 519 U.S. 278, 306 (1997) (noting that a state interest in all subjects relating to the health, life, and safety of their citizens is compatible with the Commerce Clause even though the state legislation might indirectly affect the commerce of the country) (internal citations and quotation marks omitted).

By contrast, the burden on interstate commerce imposed by such a verdict would not be excessive. It is true that such a verdict would have some effect on interstate commerce. But "it is inevitable that a state's law, whether statutory or common law, will have extraterritorial effects. The Supreme Court has never suggested that the dormant Commerce Clause requires Balkanization, with each state's law stopping at the border." Instructional Sys., Inc. v. Computer Curriculum Corp., 35 F.3d 813 (3d Cir. 1994).

Moreover, Frontier's reliance on the "extraterritorial effect" of state law is misplaced. Frontier cites Healy v. The Beer Institute, 491 U.S. 324 (1989) for the proposition that state tort law may not regulate outside its territory. Def.'s Supplemental Br. [Docket No.23] at 3. The Healy decision, however, discusses state law that is applied or seeks to control

36

commerce "that takes place *wholly outside of the state's borders*
. . . ."  Healy, 491 U.S. at 336 (emphasis added).  In the case
at bar, it is undisputed that Frontier flies in and out of
Boston, Massachusetts, that Mr. and Mrs. Stone were residents of
Massachsetts, and that the Stones made the arrangements for the
flight in Boston, Massachusetts.  Compl. ¶ 8.  As such, the
regulation in question certainly does not address commerce that
is "wholly outside" Massachusetts.

Reduced to its essence, Frontier's argument is that the
dormant Commerce Clause precludes state tort law from regulating
any activity that, while having local effects, also effectuates
some external consequences.  The *reductio ad absurdum* of this
reasoning, however, is an evisceration of state tort law because
almost every activity a state regulates has some
"extraterritorial effects."  In fact, state tort law has served
as the basis for airline liability since the inception of the
industry.  See, e.g., Goldberg v. Kollsman Instrument Corp., 240
N.Y.S.2d 592 (1963); Snell v. Intercoastal Airways, Inc., 165 So.
2d 878 (La. Ct. App. 1964); Branyan v. Alpean Flying Serv., Inc.
236 N.W.2d 739 (Mich. Ct. App. 1975).  Frontier's grave warning
that a judgment for Mrs. Stone in this case would impose
Massachusetts law on the forty-nine other states is wildly
overstated.  Choice of law principles have evolved to achieve

"certainty, predictability and uniformity of result."
Restatement (Second) Conflict of Laws § 6(2)(f) (1971).

Furthermore, Frontier's reliance on BMW of North America v.
Gore, 517 U.S. 559 (1996) is also mislaid.  The Supreme Court
concluded in Gore that one state could not punish conduct that
was "lawful where it occurred."  Id. at 572-73.  Specifically, it
held that a state "does not have the power . . . to punish [a
defendant] for conduct that was lawful where it occurred and that
had no impact on [that state] or its residents."  Id.  In this
case, Mr. Stone -- a resident of Massachusetts -- died allegedly
as a result of Frontier's negligent conduct; such conduct, if
negligent, clearly had an impact on Massachusetts residents.  As
the Supreme Court has reasoned, the Commerce Clause:

> was never intended to cut the States off from legislating
> [or regulating] on all subjects relating to the health,
> life, and safety of their citizens, though the legislation
> might indirectly affect the commerce of the country . . .
> [because state law] in a great variety of ways, may affect
> commerce and persons engaged in it without constituting a
> regulation of it, within the meaning of the Constitution.

Sherlock v. Alling, 93 U.S. 99, 103 (1876).

This Court rules that the Massachusetts' interest in
advancing the health and safety of its citizens overrides any
limited burden that enforcement of its tort laws would place upon
interstate commerce.  Unlike, for example, the tenuous state
interest implicated by the regulations in Pike v. Bruce Church,
Inc., 397 U.S. 137 (1970) (addressing a state's interest in

38

having high-quality products explicitly identified as originating

from the state), the interest in the present case is that of the

health and safety of state citizens -- a traditionally paramount

state interest.  Accordingly, the Court rules that the Commerce

Clause does not preclude Mrs. Stone's claims.

## III. CONCLUSION

For the foregoing reasons, the Court granted Frontier's

Motion to Dismiss [Docket No. 15] with respect to Count IV, but

otherwise denied the motion.  For the same reasons, the Court

denies Frontier's Motion for Reconsideration of that order

[Docket No. 38].  The Court also denies Frontier's motion for an

interlocutory appeal of the December 2, 2002 order insofar as the

Court ruled that Counts One, Two, Three, and Five were not

explicitly or implicitly preempted [Docket No. 38].  Under 28

U.S.C. § 1292(b), a district court can certify an order for an

interlocutory appeal only when it believes that "such order

involves a controlling question of law as to which there is

substantial ground for difference of opinion and that an

immediate appeal from the order may materially advance the

ultimate termination of the litigation."  The First Circuit has

stated that "interlocutory certification under Section 1292(b)

should be used sparingly and only in exceptional circumstances,

and where the proposed intermediate appeal presents one or more

difficult and pivotal questions of law not settled by controlling

authority."  <u>McGillicuddy</u> v. <u>Clements</u>, 746 F.2d 76, 77 n.1 (1st

Cir. 1984).  Based upon the Court's preceding analysis of

Frontier's preemption arguments, the Court does not believe that

this exacting standard is met here.

Accordingly, Frontier's Motion for Reconsideration or for

Section 1292(b) Certification [Docket No. 38] is DENIED.

SO ORDERED.


_____
WILLIAM G. YOUNG
CHIEF JUDGE

40